# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WISCONSIN

---

JOEL FRIEDMAN,

      Plaintiff,

v.                                                                C.A. No.

MID-WEST FAMILY SERVICES LLP,
d/b/a MID-WEST FAMILY MADISON,

      Defendant.

---

## COMPLAINT

---

### Introduction

1.    Plaintiff Joel Friedman ("Plaintiff"), by his undersigned counsel, brings this action against his former employer, Mid-West Family Madison ("Defendant"), under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") for lost wages, compensatory and punitive damages, and reasonable attorney fees and costs.

2.    Defendant terminated Plaintiff on the heels of his request for a reasonable accommodation for his ADHD disability, failing to engage in the interactive process as the ADA requires. Instead of attempting to identify and offer Plaintiff a reasonable accommodation, Defendant fired him four (4) days later instead.

### Jurisdiction and Venue

3.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because it involves federal questions under the ADA.

4.    Venue is proper in this Court under 28 U.S.C. § 1391.

5.    Plaintiff exhausted administrative remedies, timely filing an Administrative Discrimination Complaint to Wisconsin's Department of Workforce Development, Equal Rights Division ("ERD"), withdrawing the same, and receiving his Notice of Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC") on January 2, 2026. Exhibit A is the Administrative Complaint filed in *Joel Friedman v. Mid-West Family Madison*, ERD Case No.: CR202400902; EEOC Case No: 26G202400824. Exhibit B is the Notice of Right to Sue Letter.

## Parties

6.    Plaintiff Joel Friedman is an adult resident of Wisconsin, residing in Madison. He is a person with ADHD. Plaintiff's impairments substantially limit him in one or more major life activities, including but not limited to concentrating, thinking, and communicating. He is an otherwise qualified individual with a disability subject to the protections afforded under Title I of the ADA, 42 U.S.C. §§ 12111, *et seq.*

7.    Defendant Mid-West Family Services LLP, doing business as Mid-West Family Madison, is a Wisconsin company, located within this judicial district. Defendant owns and operates multiple radio stations, and sells radio and digital marketing services.

## Factual Background

8.    Plaintiff worked as a Sales Development Representative for Defendant between January 23, 2024 and March 29, 2024, when Defendant terminated him. In this position, Plaintiff was responsible for new business development, making cold calls and mass emailing prospective marketing customers.

9.      Plaintiff signed an Employment Agreement which provides that Plaintiff is responsible for "sales, services, and collection of the advertising accounts . . . assigned to" him. The Agreement further provides, Defendant "may set forth these duties more specifically from time to time and may, at [its] sole discretion, add to, subtract from, or otherwise modify these duties within the general scope of sales, service, and collection responsibilities."

10.     Plaintiff, who is currently 29 years old, was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") in 2015. Plaintiff manages his disability by taking medication, which his Primary Care Physician (PCP) prescribes.

11.     ADHD fundamentally impacts executive functions, commonly causing significant challenges with concentration, organization, and scheduling. Individuals with ADHD face unique time management, perception, and estimation challenges.

12.     Plaintiff has trouble keeping attention for long periods, multitasking when given multiple assignments at once, sitting still for long periods, and is easily distractable. He experienced these problems during his employment for Defendant, and does today. Recently, in February 2025, Plaintiff's PCP increased his medication dosage.

13.     Plaintiff disclosed his disability to Defendant during his second interview for the position, on January 17, 2024, in a meeting with his would-be supervisor, Vice President of Business Development Jerad Clark, and Executive Vice President Shar Hermanson, volunteering the information in response to an interview question. Upon information and belief, Defendant asked Plaintiff how he stays organized day-to-day. Plaintiff responded that, with ADD/ADHD, he has had to overcome organization

challenges by developing personal techniques like end-of-day priority lists and creating time schedules for the next day. In response, Clark and Hermanson responded positively, congratulating Plaintiff for overcoming this challenge with his disability.

14.    Plaintiff's ADHD disability was central to the second interview discussion. Defendant hired Plaintiff with knowledge of his disability.

15.    Defendant may have hired Plaintiff without a serious intent to accommodate his ADHD disability, and with the intent to terminate him should he request accommodation for it. Not hiring an otherwise qualified candidate after such discussion would seem suspicious under the circumstances.

16.    Defendant did not proactively reach out to Plaintiff to ask him if he needed accommodations as Plaintiff began his new position.

17.    Clark assigned Plaintiff a centrally located office, telling Plaintiff that he wanted him to always keep his door open to foster community with co-workers and so that Plaintiff could hear what was going on and learn that way.

18.    Between the high foot traffic and frequent conversation nearby, the constant noise surrounding the office made it hard for Plaintiff to concentrate, especially with the door open.

19.    Clark reprimanded Plaintiff for closing his door on several occasions.

20.    About a month into his employment, Clark reprimanded Plaintiff for taking structured breaks and for closing the door to avoid distraction. Clark told Plaintiff that these actions were the reasons why Plaintiff was not making more headway toward the goals and objectives that Clark initially set for him.

21.     Taking structured breaks is an essential ADHD-coping strategy that combats mental fatigue, reduces overstimulation, and boosts productivity by allowing the brain to recharge.

22.     Plaintiff explained that he was struggling to keep focus because of his workspace location, which was, in turn affecting his productivity, and requested a quieter space. Breaking down in tears as he explained the situation, Plaintiff told Clark that he was mentally exhausted, adding that he frequently worked late at home, well after business hours, to catch up on work, causing stress between him and his partner and further exhaustion.

23.     In response, Clark told Plaintiff that his wife also gets upset with him for working past business hours and that it was "part of the job." Clark denied Plaintiff's request for a quieter space, stated that Defendant was a "No Excuses" environment, and told Plaintiff, "Just keep trying" and that he would eventually "get it" if he followed Clark's explicit direction.

24.     Clark previously referred to Defendant's workplace as a "No Excuses Environment."

25.     In about March 2024, Plaintiff also requested, successfully, a slight change of schedule due to difficulties scheduling transportation. Defendant allowed Plaintiff to work from home for about an hour each morning (except for Tuesdays), and then commute to the office thereafter. Defendant required him to begin work at 8:00 AM sharp each day and arrive at the office by specified times, differing depending on the day.

26.     On March 25, 2024, Defendant wrote up Plaintiff for lack of communication

with managers and prospects and several other issues occurring between March 18 and 19, during which time, Defendant knew, Plaintiff was attending his brother's wedding ceremony in Boise, Idaho and unable to communicate. At hire, Plaintiff explained that he had already made these commitments months prior. Clark expressly rejected Plaintiff's request to take the time off without pay, telling Plaintiff that he would be able to manage working remotely. Clark then disciplined Plaintiff for not communicating sufficiently while participating in his brother's wedding.

27.    Plaintiff met with Clark and Hermanson in the office, where they relayed to Plaintiff that Defendant was placing him on a 10-day Performance Improvement Plan. In a document titled "Notice of Disciplinary Action" (hereafter "PIP"), Defendant laid out three areas where, it claimed, Plaintiff's performance was deficient: 1) tardiness; 2) untimeliness in responding to communications from work colleagues when working remotely; and 3) lack of focus/underproductivity. Defendant gave Plaintiff a "Written Warning," and committed to re-evaluating Plaintiff's performance in ten (10) days.

28.    That evening, Plaintiff emailed his managers regarding the meeting and PIP, reiterating his disability and its limitations, explaining that those limitations were impairing his ability to perform his job, and requesting reasonable accommodations. Specifically, Plaintiff explained that he struggled to keep up with the multiple communication channels Defendant required him to monitor, as doing so required constant shifts in attention between platforms, which in turn impaired his ability to complete sequential, multi-step tasks—such as updating multiple activity trackers— within strict time constraints.

29.    Plaintiff summarized the bullet points from the meeting as follows:

1. Be on time:
For the most part, being in the office @9:30AM Weds-Fri is very achievable (see question 2 below) and I appreciate management's understanding of my health issues and subsequent accommodations.
2. Expectation of Responsiveness: (urgent msgs- 1 hr, immediate msgs- 4 hours, emails-by eod) I also completely agree that it's imperative to stay and keep others, especially management in the loop when working remotely.

That said, it is exceedingly difficult for me to keep up between our communication channels being scattered (google chat, email, comments on a Google worksheet) and my ADD tendencies to hyperfocus on specific tasks that cause me to misdirect my attention when it is needed elsewhere. Additionally, it makes tracking down important information in a message that much more inconvenient and time-consuming to track down.

I want to emphasize this is an explanation, not a justification and I will make every attempt in the future to keep the timeliness of my responses within managerial expectations.

Something that would help me significantly is if we had a primary internal messaging board as the single source of truth such as Slack, Teams or Discord.

Short of this, if something is urgent and I appear to be unresponsive, please feel free to spam my cell phone via call or text and I will answer.

30.    In sending the March 25 Email, Plaintiff advised his employer of his need for, and requested, an accommodation for his ADHD disability. Plaintiff asked Defendant to use software that would consolidate multiple communication channels, promoting greater message visibility and simpler coordination with co-workers and prospects, and listed multiple examples of industry-standard messaging platforms that the parties could utilize to accomplish this accommodation.

31.    In his subsequent email reply on March 26, Clark did not address Plaintiff's disability-related concerns or specific accommodation request whatsoever. Instead, Clark

briefly addressed other points that Plaintiff raised in the email.

32.     Defendant purposely failed to engage in an interactive process with Plaintiff regarding proposed accommodations and failed to provide Plaintiff with any accommodations in response to the request Plaintiff made in the March 25 Email.

33.     Once Plaintiff sent the March 25 Email, Defendant sought any reason to terminate Plaintiff in order to avoid the costs of attempting accommodation.

34.     At the end of the week, on Friday, March 29, 2024, despite Plaintiff showing marked performance improvements, Defendant fired Plaintiff based on an unsubstantiated allegation that Plaintiff disparaged Defendant in the office, for being approximately (5) five minutes late to a weekly sales meeting due to being caught in a heavy rainstorm, and for failing to complete tasks that were not possible to perform.

35.     On Tuesday, March 26, 2024, Plaintiff was five minutes late to a weekly sales meeting. However, he explained to Defendant, there was almost an inch of precipitation and extreme weather on the US-12 Beltline that morning, causing him to slow down, consistent with surrounding traffic. During an earlier incident of tardiness, Plaintiff also explained that his ADHD symptoms sometimes caused him to lose track of time.

36.     Defendant falsely claimed that on March 27, 2024, Plaintiff made disparaging statements about working at Defendant. Plaintiff denies doing so and would not have engaged in such conduct, as he was on his best behavior in the wake of the first disciplinary meeting/PIP and actively trying to impress management.

37.     Defendant also falsely alleged that Plaintiff failed to meet the PIP's

productivity goals, claiming that he only logged two calls for the week of March 25 to March 29. Plaintiff made many calls that week. Additionally, earlier that week, Plaintiff sought feedback in person from Clark in the office, who told Plaintiff he was doing fine.

38.    In the PIP, Defendant stated that Plaintiff "did not complete daily agenda items" on March 26 and 28, pushed off completion of his "nurture list" from March 27 to March 28, and failed to update or launch certain Ad Tech & Lead Gen sequences. In fact, Defendant did not ask Plaintiff to complete those sequences during the week of March 25 to March 29. During the first disciplinary meeting, Defendant asked Plaintiff to update and launch three different sequences MIA, April 3rd event, and Promotions, which he successfully did.

39.    Additionally, Defendant claimed that Plaintiff failed to complete a task that was not possible for Plaintiff to complete. Clark dismissed Plaintiff when he tried to explain the issue, insisting to Plaintiff—despite never using the software in question himself—that Plaintiff was incorrect.

40.    Defendant terminated Plaintiff on Day 5 of the PIP because of performance deficiencies caused by his disability, rather than reevaluating him at the end of that period as it promised to do.

41.    Defendant fired Plaintiff to avoid accommodating his ADHD disability.

42.    Defendant retained employees without ADHD who were late as often as or by greater amounts than Plaintiff, and who engaged in comparably serious acts of misconduct as Plaintiff, failing to discipline them whatsoever for the same.

## Claims for Relief
### Count I:  Failure to Provide Reasonable Accommodation
(Violation of ADA, 42 U.S.C. § 12112)

43.    Plaintiff incorporates all preceding allegations of fact.

44.    Plaintiff is "disabled" under the ADA because his ADHD is a "physical or mental impairment that substantially limits one or more of [his] major life activities," he has a record of such an impairment, and Defendant regarded him as having such an impairment. 42 U.S.C. § 12102(1). Amongst others, ADHD limits Plaintiff in the major life activities of concentrating, thinking, and communicating. *Id.*

45.    Plaintiff is a "qualified individual" with a disability under 42 U.S.C. § 12111(8), as he could have performed the essential functions of his Sales Representative position with a reasonable accommodation, had Defendant provided him one, but Defendant failed to do so.

46.    Defendant's failure to engage in an interactive process with Plaintiff after Plaintiff raised disability-related issues affecting his work performance and requested an accommodation in the form of a centralized communication channel prevented the parties from identifying an appropriate accommodation.

47.    Defendant failed to provide Plaintiff with a reasonable accommodation, violating the ADA.

### Count II:  Retaliation
(Violation of ADA, 42 U.S.C. § 12203)

48.    Plaintiff incorporates all preceding allegations of fact.

49.    Plaintiff engaged in statutorily protected activity under the ADA when he

requested accommodation in the form of a centralized communication channel.

50.     Plaintiff was performing his job satisfactorily and in accordance with Defendant's legitimate expectations at the time he made the request.

51.     Plaintiff's termination is causally related to his exercise or attempted exercise of ADA rights on March 25, 2024.

52.     Defendant treated Plaintiff worse than similarly situated employees who did not engage in statutorily protected activity under the ADA, retaining them when they engaged in comparably serious conduct under similar circumstances.

## Count III:  Termination Because of Disability
### (Violation of ADA, 42 U.S.C. § 12112)

53.     Plaintiff incorporates all preceding allegations of fact.

54.     Plaintiff is "disabled" within the meaning of the ADA.

55.     Plaintiff was/is a "qualified individual" with a disability who could have performed/could perform the essential functions of his Sales Representative position with a reasonable accommodation.

56.     Plaintiff suffered from an adverse employment action, namely discharge.

57.     Plaintiff's termination is causally related to his disability.

58.     Defendant treated Plaintiff worse than similarly situated employees without ADHD when they engaged in comparably serious conduct under similar circumstances.

## Damages

59.     By virtue of the Defendant's unlawful and intentional actions as alleged

herein, Plaintiff has suffered mental and emotional distress and embarrassment, sustained lost wages and lost future earning capacity, other financial losses, and other damages for which he should be compensated by Defendant in an amount deemed just by the Court.

60.     Because Defendant's actions as alleged herein were carried out maliciously or with reckless disregard for Plaintiff's rights, Plaintiff seeks an award of punitive damages against Defendant, to deter them and others similarly situated from committing similar wrongful and unlawful acts in the future.

## **Request for Relief**

**WHEREFORE**, Plaintiff Joel Friedman respectfully requests that the Court:

1.   Enter a declaratory judgment that Defendant Mid-West Family Services LLP d/b/a Mid-West Family Madison, engaged in disability-based discrimination and retaliation, in violation of Plaintiff's rights under the ADA, 42 U.S.C. §§ 12112 and 12203;

2.   Award Plaintiff lost compensation, as well as damages for emotional pain and suffering, mental anguish, humiliation and anxiety, career losses, dignitary and reputational harm, in an amount to be proven at trial;

3.   Award Plaintiff punitive damages, in an amount to be proven at trial;

4.   Award Plaintiff reasonable attorney fees, litigation expenses, and costs of suit under 42 U.S.C. § 12205; and

5.   Order all such other relief as this Court deems just and equitable.

Dated this 27th day of March, 2026.

Respectfully submitted,

**O'CONNOR LAW FIRM**
*Attorney for Plaintiff Joel Friedman*

s/ *Patrick M. O'Connor*

Patrick M. O'Connor, Esq. (SBN 1094992)
PO Box 930133
Verona, WI 53593
(608) 203-6349
pat@wilaborlaw.com